# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————— )
PATTI HAMMOND SHAW,                                          )
                                                            )
      Plaintiff,                                        )
                                                            )
          v.                                      )      **Civil Action No. 12-0538 (ESH)**
                                                            )
DISTRICT OF COLUMBIA, *et al.*,                             )
                                                            )
      Defendants.                                       )
———————————————————————— )


## MEMORANDUM OPINION

Plaintiff Patti Hammond Shaw ("Shaw"), a transgender woman who has undergone sex reassignment surgery and had her sex legally changed to female, alleges that on three separate occasions she has been arrested in the District of Columbia and subjected to treatment by the Metropolitan Police Department ("MPD") and the United States Marshals Service ("USMS") in violation of the Fourth and Fifth Amendments to the United States Constitution, the Federal Tort Claims Act, the D.C. Human Rights Act, and D.C. tort law.  (First Am. Compl., Sept. 17, 2012 [ECF No. 27] ("Compl.").)  She brings this action against the District of Columbia ("District"); MPD Chief of Police Cathy Lanier, in her official capacity; Lieutenant Merrender Quicksey, an MPD officer, in her individual capacity; the United States; Benjamin E. Kates, Steve Conboy and Troy Musgrove, USMS Marshals, in their individual capacities (collectively the "USMS defendants"); and other unknown MPD and USMS employees.[1]

---

[1] Plaintiff voluntarily dismissed defendant Thomas O'Donnell.  (*See* Notice of Voluntary Dismissal, Nov. 5, 2012 [ECF No. 35].)

Before the Court are three motions to dismiss:  one filed jointly by the USMS defendants ("USMS Mot.") [ECF No. 28]; one filed by Quicksey ("Quicksey Mot.") [ECF No. 41]; and one filed by Lanier ("Lanier Mot.") [ECF No. 37].  For the reasons stated herein, the Court will (1) grant the USMS defendants' motion as to the claims against Conboy, but deny it as to the claims against Kates and Musgrove; (2) deny Quicksey's motion; and (3) grant Lanier's motion.

## BACKGROUND

### I.    FACTS

The following factual recitation is based on the allegations in plaintiff's complaint and must, for purposes of these motions, be accepted as true.  Plaintiff is now, and was at all times relevant to this case, a female whose legal name is Patti Hammond Shaw.[2]  (Compl. ¶ 2.)

---

[2] A person's "biological status as either male or female" is known as his or her "sex."  American Psychological Association, *Answers to Your Questions About Transgender People, Gender Identity, and Gender Expression* at 1 (2011) ("APA Transgender Publication"), *available at* http://www.apa.org/topics/sexuality/transgender.pdf.  A person's sex is initially "assigned at birth," based "primarily on physical attributes such as chromosomes, hormone prevalence, and external and internal anatomy."  *Id.*

Plaintiff is also a "transgender woman,"[3] who has "undergone sex reassignment surgery," and "had her sex legally changed [from male] to female."[4] (*Id.* ¶ 2.)

Since changing her sex to female, plaintiff has been arrested by the MPD on three occasions: June 18, 2009, December 10, 2009, and June 6, 2012. (*Id.* ¶¶ 15, 44, 73.) In the District, the first time a person is arrested, he/she is assigned a unique Police Department identification number ("PDID"), which is recorded in the MPD's computerized record system. (*Id.* ¶¶ 96-97.) When plaintiff was first arrested by the MPD she was male, and neither the name nor sex associated with her PDID number has ever been changed. (*Id.* ¶¶ 98-100.)

After each of the three arrests that are the subject of plaintiff's complaint, the MPD held her with the male detainees, first at the Sixth District police station ("6D")[5] and then at the

---

[3] The term "transgender" is "an umbrella term for persons whose gender identity, gender expression, or behavior does not conform to that typically associated with the sex to which they were assigned at birth." APA Transgender Publication at 1 (emphasis omitted). "Transsexual" is the clinical term used to describe a transgender person, like plaintiff, whose "gender identity," the "internal sense of being a male, female or something else" is different from the sex assigned at birth. *Id.*; *see also* D.C. Code § 2-1401.02(12A) ("'Gender identity or expression'" means a gender-related identity, appearance, expression, or behavior of an individual, regardless of the individual's assigned sex at birth.") A transsexual person may decide to undergo "gender transition," the term used to describe the "complex process" of altering a person's birth-assigned sex to match his or her gender identity," which "may involve one or more of the following: adopting the appearance of the desired sex through changes in clothing and grooming, adopting a new name, changing sex designation on identity documents (if possible), using hormone therapy treatment, and/or undergoing medical procedures that modify their body to conform with their gender identity." APA Publication at 3.

[4] District law provides that "Upon receipt of a certified copy of an order of the Court indicating that the sex of an individual born in the District has changed by surgical procedure and that such individual's name has been changed, the certificate of birth of such individual shall be amended as prescribed by regulation." D.C. Code § 7-217(d); *see In re Taylor*, 2003 WL 22382512 (D.C. Super. Ct. Mar. 17, 2003) (§ 7-217(d) gives a transsexual person the legal right to change sex on birth certificate after having sex changed by surgical procedure).

[5] On June 18, 2009, plaintiff presented herself for arrest at 6D having learned that there was a warrant for her arrest. (Compl. ¶¶ 15-16.) On December 10, 2009, plaintiff was arrested at her home, taken to United Medical Center for "medical treatment," the nature of which is not

3

MPD's Central Cellblock. (Compl. ¶¶ 17, 46, 74.) At 6D, plaintiff was held in a single cell in the male area, facing the men who were in the cell across from her. (*Id.*) Similarly, in the Central Cellblock plaintiff was held in a single cell in the men's area, facing the male detainees in the cell across from her.[6] At both locations, the male detainees verbally and physically harassed her, as did one MPD officer.[7] (*Id.* ¶¶ 19, 48, 52, 53, 76, 81, 82.) During December 2009 and June 2012, Quicksey was the manager of the Central Cellblock (*id.* ¶¶ 5, 51), "the individual designated by the Commanding Officer to be responsible for managing all aspects of the station/holding facility area on a 24-hour basis." MPD Standard Operating Procedures for Holding Facilities at 2 (May 30, 2003) ("MPD Holding Facilities Procedures"). The complaint

---

specified, and then taken to 6D. (*Id.* ¶¶ 44-46.) On June 26, 2012, plaintiff was arrested and transported to 6D. (*Id.* ¶ 73.)

[6] In June 2012, there was another transgender detainee in the Central Cellblock, who was also placed in a single cell facing the men. (Compl. ¶ 82.)

[7] At 6D, for example, in June 2009, plaintiff "was verbally assaulted by male detainees who asked to see her vagina, breasts, and buttocks" and "while MPD officers were taking [her] out of her cell, they were simultaneously bringing in a male detainee who touched [her] on her buttocks." (Compl. ¶ 19.) In December 2009, she "was repeatedly harassed by the men in the other cell. One man threatened that if [she] did not show him her breasts, he would hit her in the face when they would later be together in the bullpen. Feeling scared, [she] showed the man her breasts and many of the men masturbated in front of her." (*Id.* ¶ 48.) And in June 2012, when she used the bathroom "male detainees in the station made noise and said 'that's a girl' and began masturbating." (*Id.* ¶ 76.) After that incident, plaintiff told an MPD officer that "she wanted to be in the women's area, but he said he wouldn't move her." (*Id.* ¶ 76.) On this occasion she was also searched by three male MPD officers, who "made her pull down her bra, shirt, and pants, and bend over." (*Id.* ¶ 78.)

At the Central Cellblock, in December 2009, "[t]he men in the cell near [her] harassed her and masturbated in front of her" (Compl. ¶ 52) and an MPD officer "exposed his genitalia to [her] and urinated in front of her." (*Id.* ¶ 53.) Plaintiff's experience in June 2012 was similar. The "male detainees made sexual comments such as asking [plaintiff] to shake her buttocks" and "[w]hen she used the bathroom in her cell, the male detainees saw that she had female anatomy" and one of them "began masturbating and later threw some kind of thick liquid towards [her] which landed in her cell." (*Id.* ¶ 82.)

alleges that he failed to train, supervise or discipline MPD employees in the Central Cellblock in the proper treatment of female transgender detainees.  (Compl. ¶¶ 153, 156).

Essentially, the MPD treated plaintiff as if she were a male, despite knowing that she was a transgender female,[8] and in apparent violation of its own policy, which provides that "[w]hen male and female prisoners are detained in the holding facility for adults . . .  the male and female prisoners shall be separated by sight and sound."  MPD Holding Facilities Procedures at 11.[9] The MPD's General Order for "Handling Interactions with Transgender Individuals" was also in effect at the time of plaintiff's arrests.  *See* MPD General Order 501.02 (Oct. 16, 2007) ("MPD Transgender Order").  Its provisions "supplement" existing orders unless "a directive involving the same operation is clearly contradictory," in which case the provisions "supersede and amend the contradictory language."  *Id.* at 10.  It provides, in the section headed "Processing and Housing of Transgender Arrestees," that "[w]henever practical, transgender arrestees shall be placed in a cell by him/herself, even when more than one transgender person is in custody at the same MPD facility at the same time."[10]  *Id.* at 7.  It also provides that "[m]embers shall bring

---

[8] In June 2009, upon her arrival at 6D, plaintiff informed unknown MPD employees that she was legally a female, and she presented identification that confirmed that fact.  (Compl. ¶ 17.)  In December 2009, the arresting officer identified her as a female.  (*Id.* ¶ 44.)  In June 2012, unknown MPD employees "learned that [plaintiff] is a transgender woman."  (*Id.* ¶ 74.)

[9] The MPD defines "Holding Facility" as "a temporary confinement facility for which custodial authority of a prisoner is usually less than 48 hours, pending their release, arraignment, adjudication, or transfer to another facility."  MPD Holding Facilities Procedures at 1.

   The Central Cellblock [and] each cellblock in the District . . . [are] holding facilities."  (*Id.*)

[10] In its entirety, the section of the MPD Transgender Order that sets forth "[t]he general rules for processing and housing transgender arrestees" states:

> a. Processing officers are required to search all prisoners they process, even if the prisoner has just been searched by the arresting and/or the transporting officer.

b. Whenever practical, transgender arrestees shall be placed in a cell by him/herself, even when more than one transgender person is in custody at the same MPD facility at the same time.

c. MPD personnel assigned to any holding facility must be cognizant of the gender identity or expression of all arrestees being processed so that accurate gender information can be recorded and inconsistencies properly noted and documented as follows:

(1) When a member finds a record for an arrestee (e.g., LiveScan, CJIS, WACIIS, WALES, NCIC, or any other law enforcement database) that lists a different gender from what the arrestee is currently presenting, the member shall immediately notify the Watch Commander and apprise him/her of the situation.

(2) The Watch Commander shall evaluate the documentary evidence available and, if practical, speak with the arrestee and determine the course of action to take with regard to housing the arrestee.

(3) Information concerning conflicting gender information on the arrestee's computer records shall be clearly noted on the PD Form 163 and other arrest paperwork such as the PD Form 252 (Supplemental Report).

(4) In addition to conflicting gender information being noted on the paperwork, members shall verbally bring this information to the attention of all personnel that they transfer custody of the arrestee to. Members transporting such an arrestee to another MPD facility shall advise the personnel at the receiving facility of the housing requirements and "AT-RISK" status of the arrestee.

(5) Members shall bring conflicting gender information to the attention of the US Marshal's Service when the arrestee is remanded to their custody.

(6) In other situations involving the transfer of transgender or ambiguously gendered prisoners (e.g., processing by federal authorities or other police agencies), members shall ensure that all paperwork accompanying the prisoner adequately describes the gender-related identity issues that are presented.

(7) Restrictions on the wearing of appearance-related items must be consistent with restrictions on the wearing of similar items for non-transgender individuals. Appearance-related items, including, but not limited to, prosthetics, clothes of the presenting gender, wigs, or make-up

conflicting gender information to the attention of the US Marshal's Service when the arrestee is

remanded to their custody." (MPD Transgender Order at 8.)   When the MPD Transgender

Order was adopted in 2007, Conboy was the U.S. Marshal for the Superior Court.

From MPD custody, plaintiff was transferred to the USMS cellblock at Superior Court

and to USMS custody.[11]  (*Id.* ¶¶ 21, 58, 86.)  The USMS also knew that plaintiff was legally a

female,[12] but treated her as if she were a male.  Each time she was transferred to the USMS

cellblock, she was searched by male USMS employees (*id.* ¶¶ 23-26, 58-59, 87), even when

female USMS employees were available.[13]   The USMS Policy Directive on "Body Searches,"

the purpose of which is to set forth the "procedures necessary for conducting both reasonable and

legal searches," provides that an "[i]n-custody [s]earch" is conducted "upon acceptance of a

prisoner at the USMS cellblock."[14]  USMS Policy Directive 99-25, Body Searches at 3 (July 7,

1999) ("USMS Search Policy").   An "in-custody" search requires removal of outer clothing for

---

should not be confiscated or removed from transgender individuals unless
such items present a safety hazard or are needed for evidentiary reasons.

MPD Transgender Order at 7-8.

[11] As noted, *see supra note 10*, MPD employees are supposed to "bring conflicting gender
information to the attention of the US Marshal's Service when the arrestee is remanded to their
custody." (MPD Transgender Order at 8.) The complaint alleges in the alternative either that the
MPD failed to properly inform the USMS of plaintiff's transgender status upon the transfer of
custody or that the MPD did inform the USMS, but the USMS ignored that information.
(Compl. ¶¶ 28, 61, 62, 90.)

[12] For example, in June 2009, during intake, when plaintiff was asked her name, she gave them
her legal female name, and showed her legal identification, but unknown USMS employees
asked her to repeat herself, told her "she was wrong," and answered for her that she was a man
and that her "real" name was Melvin.  (Compl. ¶ 22.)

[13] In June 2009, there was a female USMS employee prepared to search plaintiff.  (Compl. ¶ 23.)

[14] The USMS Search Policy defines five types of searches: (1) a pat-down search; (2) an "in-
custody search"; (3) a "strip search"; (4) a "digital cavity search"; and (5) a "search incident to a
lawful arrest."  USMS Search Policy at 1.

inspection and a visual inspection of the detainee.[15]  *Id.* at 2-3.  A "strip search" is also

authorized under certain circumstances.  *Id*. at 3.  It differs from an in-custody search in that it

involves a "complete search of a prisoner's attire and a visual inspection of the prisoner's naked

body, including body cavities," but is similar in that it "*should not* involve touching the skin

surface."[16]  *Id.*  Generally, both types of searches are to be conducted "by a deputy of the same

sex," although "in extenuating circumstances, or when the need for security dictates, an in-

custody search may be conducted by a deputy of the same sex."  *Id.* at 5.

    As alleged, the searches of plaintiff did not comply with the USMS search policy for "in-

custody" or "strip searches" as they were conducted by male USMS employees, in view of male

detainees.  In addition, during the searches, male USMS employees verbally harassed her (*id.* ¶¶

26, 59)[17] and intimately and inappropriately touched her.[18]  (*Id*. ¶¶ 25, 87.)  In December 2009,

---

[15] Specifically, during an "in-custody" search, the prisoner is to "remove his or her outer clothing
and shoes/socks until the search of both is complete," while the marshal is supposed to "remove
the contents from all the pockets found on the prisoner's clothing, as well as any jacket, coat,
belt, eyeglasses or other clothing articles belonging to the prisoner," "visually inspect behind
each ear and look inside the prisoner's ear canals, nostrils, and mouth," and "inspect all property
removed from the prisoner."  USMS Search Policy at 2-3.

[16] In addition, a strip search is supposed to be conducted (1) in a "private location that prevents
all but designated personnel from viewing the prisoner," (2) "always . .. by a deputy of the same
sex, unless the person conducting the search is a physician, physician's assistant, or nurse," (3)
with a "witness of the same sex of the person being searched . . . present" or a deputy of the
opposite sex positioned outside the room and out of the prisoner's view "to corroborat[] the
remarks made by individuals in the room and providing assistance in the event of an
emergency."  USMS Search Policy at 3.  In addition, a strip search is to be "done in a
professional manner, causing the prisoner as little embarrassment as possible.  *Id*. at 4.

[17] For example, in June 2009, other USMS employees made "comments about her breasts and
gender, such as 'those must be implants because hormones don't make breasts stand up so perky
like that,' and 'he's the best I've ever seen.'"  (Compl. ¶ 26.)  In December 2009, defendant
Musgrove, who was conducting the search, commented to plaintiff, "you need Jenny Craig, all
those butt shots you got in your butt" and "here he goes again; what you done this time boy?"
(*Id.* ¶ 59.)

[18] In June 2009, the USMS employee conducting the search "groped her breasts, buttocks, and

the search was conducted by Musgrove, the USMS District Security Officer at the Superior

Court.  (*Id.* ¶¶ 10, 58, 59.)

Plaintiff was also held in a bullpen with male detainees (*id.* ¶¶ 30, 64, 86), even after

requesting to be moved.[19]  While there, she was harassed by the male detainees (*id.* ¶¶ 31, 65)[20]

and subjected to other indignities.[21]  (*Id.* ¶ 34.)  The USMS employees who were present did

nothing to help stop the harassment, even when plaintiff complained.  (*Id.* ¶¶ 34, 65.)

When the MPD's Transgender Order was adopted in 2007, Conboy was the U.S. Marshal

for the Superior Court.  (*Id.* ¶ 9.)  The complaint alleges that in response to that order he

established policies of having "male USMS marshals search female transgender detainees" (*Id.*

¶¶ 126, 130, 134) and of "intentionally disregarding gender information about transgender

detainees communicated by employees of the Metropolitan Police Department to members of the

United States Marshals Service upon remand of the detainee to the custody of the United States

Marshals Service" (*id.* ¶¶ 9, 28, 39, 40, 61, 68, 69, 90), and that these policies remained in effect

---

between her legs repeatedly and excessively during the 'search,' which lasted about five
minutes."  (Compl. ¶ 25.)  In June 2012, the male USMS employee conducting the search "lifted
up [her] blouse and looked at her breasts and areola and searched in between her legs and in
between her buttocks, feeling these areas with his hand for about a minute," all the while
exposing plaintiff to the view of other men in the cellblock.  (*Id.* ¶ 87.)  He also "touched her
breasts and asked 'What is this, a bra?'"  (*Id.* ¶ 87.)  During the entire search, plaintiff "was
exposed to view by other men in the cellblock."  (*Id.* ¶ 87.)

[19] When plaintiff was put in the bullpen in June 2009, she requested that she be moved, but she
was kept there from 8:00 a.m. until 4:00.p.m.  (Compl. ¶ 32.)

[20] For example, in June 2009, "[s]everal of the men in the holding cell touched [her]
inappropriately, verbally harassed and propositioned her, threatened to punch her if she did not
show her breasts to them, and shook their penises at her."  (Compl. ¶ 31.)  In December 2009, a
man who had previously threatened her "told the other men in the bullpen, 'that n*** got a
pussy,'" and he "threatened to punch [p]laintiff again if she did not show him and the other men
her vagina."  (*Id.* ¶ 65.)  Out of concern for her safety, plaintiff complied.  (*Id.* ¶ 65.)

[21] For example, in June 2009, plaintiff was forced to urinate into a cup in full view of the men in
the holding cell, exposing her female genitalia.  (Compl. ¶¶ 33, 43.)

at the time of plaintiff's arrests.  In 2009, Kates was the U.S. Marshal for the Superior Court.

(*Id.* ¶ 8.)  The complaint alleges that he maintained Conboy's policies and failed to train,

supervise or discipline USMS employees in the proper treatment of female transgender

detainees.  (*Id.* ¶¶ 119, 123, 127, 140).

## II.  PROCEDURAL HISTORY

Based on her treatment following each arrest, plaintiff filed two separate complaints,

which were consolidated in the above-captioned case.  (*See* Memorandum Opinion and Order,

Sept. 17, 2012 [ECF No. 26].)  The operative complaint is the First Amended Complaint, which

includes eleven separate claims, four of which are addressed by the motions to dismiss filed by

the USMS defendants, Quicksey and Lanier.[22]  Those claims are: (1) a Fourth Amendment

*Bivens* claim against Conboy, Kates, Musgrove and other unknown USMS employees based on

the three searches that took place which plaintiff was in USMS custody (Count VI) (Compl. ¶¶

122-134) ("Fourth Amendment *Bivens* Claim"); (2) a Fifth Amendment *Bivens* claim against

Conboy, Kates, and other unknown USMS employees based on the conditions of confinement

while she was in USMS custody (Count VIII) (*id.* ¶¶ 137-147) ("Fifth Amendment *Bivens*

Claim"); (3) a Fifth Amendment § 1983 claim against Quicksey and unknown MPD employees

---

[22] The remaining claims are (1) claims against the District and unknown MPD employees for
common law torts (intentional infliction of emotional distress, negligent infliction of emotional
distress, assault and battery, invasion of privacy and negligence) allegedly committed while
plaintiff was in MPD custody in June 2012 (Counts I-IV, XI) (Compl. ¶¶ 101-115, 165-69)
("Common Law Tort Claims"); (2) a claim against the United States under the Federal Tort
Claims Act ("FTCA") based on the allegedly tortious conduct of USMS employees while
plaintiff was in USMS custody in June 2009 and December 2009 (Count V) (*id.* ¶¶ 116-121)
("FTCA Claim");  and (3) a § 1983 claim against unknown MPD employees alleging that the
June 2012 search of plaintiff while in MPD custody violated the Fourth Amendment (Count VII)
(*id.* ¶¶ 135-36) ("Fourth Amendment § 1983 Claim").  With respect to the remaining defendants,
the District of Columbia has filed an answer (District Answer, Oct. 7, 2012 [ECF No. 31]) and
the United States has been granted leave to file its answer after the resolution of the USMS
defendants' motion to dismiss (Minute Order, Oct. 19, 2012).

based on the conditions of confinement while plaintiff was in MPD Custody (Count IX) (*id.* ¶¶ 148-156) ("Fifth Amendment § 1983 Claim"); and (4) a D.C. Human Rights Act claim against the District of Columbia, Lanier, and unknown MPD employees, for discrimination on the basis of gender identity and expression (Count X) (*id.* ¶¶ 157-64) ("D.C. Human Rights Act Claim").

## ANALYSIS

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal* 556 U.S. 662, 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Facial plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotations omitted)."

The USMS defendants have filed a motion to dismiss the Fourth and Fifth Amendment *Bivens* Claims against them on the ground of qualified immunity (all defendants) or insufficient allegations of personal involvement to state a claim (Conboy and Kates);[23] Quicksey has filed a motion to dismiss the Fifth Amendment § 1983 Claim against her on the ground of qualified

---

[23] The motion filed by the USMS defendants also seeks dismissal of the Fourth and Fifth Amendment *Bivens* claims against the unknown USMS employees "for lack of personal service of process" within the 120-day time limit provided in Federal Rule of Civil Procedure 4(m). (USMS Mem. at 20-21.) Dismissal of the unknown USMS employee defendants is not warranted. First, "[u]ndersigned counsel do not at this time represent [those employees]." (USMS Mem. at 1 n.1, 20-21.) Second, courts recognize an exception to Rule 4(m) for cases involving "John Doe" defendants when discovery will make known "the otherwise unavailable identity of the defendant." *Newdow v. Roberts*, 603 F.3d 1002, 1010 (D.C. Cir. 2010).

immunity; and Lanier has filed a motion to dismiss the D.C. Human Rights Act Claim against

her on the ground that service was improper or, in the alternative, that it is redundant.

Accordingly, the Court will now turn to the three pending motions to dismiss.

## I.     QUALIFIED IMMUNITY

Conboy, Kates, Musgrove, and Quicksey each seek to dismiss the constitutional claims

against them on the ground that the doctrine of qualified immunity protects them from personal

liability.  "The doctrine of qualified immunity protects government officials 'from liability for

civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*,

555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see Jones v.

Horne*, 634 F.3d 588 (D.C. Cir. 2011).  As laid out by the Supreme Court, the two pertinent

questions in determining whether qualified immunity applies are (1) "whether a constitutional

right would have been violated on the facts alleged," and (2) "whether the right was clearly

established" at the time of the violation.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[24]  "'Clearly

established' for purposes of qualified immunity means that 'the contours of the right must be

sufficiently clear that a reasonable official would understand what he is doing violates that

right.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *see also Wilson v. Layne*, 526 U.S. 603,

614-15 (1999).  The inquiry as to whether a right is "clearly established" "must be undertaken in

light of the specific context of the case, not as a broad general proposition."  *Anderson v.

Creighton*, 483 U.S. 635, 640 (1987); *Wilson v. Layne*, 526 U.S. 603, 615 (1999) ("the right

allegedly violated must be defined at the appropriate level of specificity before a court can

---

[24] The "sequence set forth" in *Saucier*, though "often appropriate," is not "mandatory," and courts may "exercise their sound discretion" in deciding which question to address first. *Pearson*, 555 U.S. at 236.

determine if it was clearly established"); *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2084 (2011) (what is "clearly established" is not to be defined at a "high level of generality"). However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful." *Wilson*, 526 U.S. at 615. Officials can be on notice that their conduct violates established law even in "novel factual circumstances," and there is no requirement that previous cases be "fundamentally similar." *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

### A.    Fourth Amendment Claim

Plaintiff claims that she was subjected to three unconstitutional searches in violation of the Fourth Amendment while she was in USMS custody, and she seeks to hold the USMS defendants personally liable for those violations. (Compl. ¶¶ 123, 127, 131.) The USMS defendants claim they are entitled to qualified immunity because none of the searches violated a clearly established constitutional right.[25]  (USMS Mem. at 15.) For purposes of this argument, the USMS defendants do not distinguish among themselves or the particular searches, even though their potential liability rests on different theories and the facts of each search are not identical.

"The Fourth Amendment prohibits only unreasonable searches." *Bell v. Wolfish*, 441 U.S. 520, 558 (1979). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need

---

[25] Plaintiff's claim against Conboy is based on the allegedly unconstitutional policies he created while he was the U.S. Marshal for the Superior Court; her claim against Kates is based on his alleged failure to train, supervise or discipline USMS employees in the proper treatment of female transgender detainees; and her claim against Musgrove is based on his conducting the December 2009 search.

for the particular search against the invasion of personal rights that the search entails.  Courts

must consider the scope of the particular intrusion, the manner in which it is conducted, the

justification for initiating it, and the place in which it is conducted."  *Id.* at 559.  The balancing

inquiry set forth in *Bell* "remains the same regardless of how one characterizes the search."  *See*

*BNSF Ry. Co. v. Dep't of Transp.,* 566 F.3d 200, 208 (D.C. Cir. 2003).  In the particular context

of a detention facility, the question of reasonableness requires "balancing the significant and

legitimate security interests of the institution against the privacy interest of the inmates."  *Bell*,

441 U.S. at 560.  However, an "abusive" search is never reasonable.  *Id.* ("on occasion a security

guard may conduct the search in an abusive fashion . . .  such an abuse cannot be condoned").

The USMS defendants argue that "[a]t the time of the searches in June 2009, December

2009, and June 2012, the state of the law was not clearly established as to the classification and

searches of transgender female detainees."  (USMS Mot. at 12.)  To support their argument, the

USMS defendants rely primarily on the fact that the "D.C. Circuit has not reviewed the

constitutional bounds of transgender arrestees" and the absence of "any cases from any

jurisdiction that address whether a male law enforcement officer may constitutionally search a

transgendered woman who is listed as being male in law enforcement records."  (*Id.*)  The flaw

in this argument is that it fails to account for the fact that plaintiff is legally a female[26] and that

the USMS employees knew it.  Thus, contrary to what the USMS defendants argue, the searches

of plaintiff were "cross-gender" searches.  As the law on cross-gender searches is relevant, the

absence of cases directly addressing the constitutional bounds of searches of transgender

arrestees is not dispositive.

---

[26] The USMS defendants refer to plaintiff as "biologically male, but 'legally female,'" but that
terminology is meaningless.  As set forth above, plaintiff's assigned sex at birth was male, but
she is now legally a female.

With respect to the law on cross-gender searches, the USMS defendants argue that the searches of plaintiff are akin to the cross-gender searches held to be reasonable in *Michenfelder v. Sumner*, 860 F.2d 328, 334 (9th Cir. 1988), *Grummett v. Rushen*, 779 F.2d 491, 496 (9th Cir. 1985), *Schmidt v. City of Bella Villa*, 557 F.3d 564, 572-73 (8th Cir. 2009), and *Farkarlun v. Hanning*, 855 F. Supp. 2d 906, 924 (D. Minn. 2012).  The USMS defendants are correct that cross-gender searches are not "per se" unconstitutional.  *See, e.g., Farkarlun*, 855 F. Supp. 2d at 924.  But they ignore the fact that in each case they cite, the "cross-gender" search that the court found to be reasonable was significantly less intrusive than the searches of plaintiff in manner and scope.  In particular, none of the approved cross-gender searches involved unnecessary and intimate physical contact in conjunction with verbal harassment.  *See Michenfelder*, 860 F.2d at 332 (cross-gender searches not unreasonable if "visual only, involving no touching"); *Grummett*, 779 F.2d at 494 (cross-gender strip searches not unreasonable because "[f]emale guards [are]. . . assigned [to positions that] require infrequent and casual observation, or observation at a distance"); *id.* (routine cross-gender pat-down searches which includes the groin area not unreasonable because "searches do not involve intimate contact with an inmate's body" and the "guards have conducted themselves in a professional manner"); *Schmidt*, 557 F.3d at 572-73 (unzipping pants to allow photograph of female detainee's tattoo by male officer was not unreasonable); *Farkarlun*, 855 F. Supp. 2d at 927-28 (visual strip search was not unreasonable).

In contrast, the cross-gender searches of plaintiff did involve intimate physical contact.[27] In similar cases, courts have consistently held that, absent emergency circumstances, such a

---

[27] The searches alleged in the complaint could be characterized as "strip searches," although the "exact label" for an intrusion is not important.  *See Safford Unified Sch. Dist. #1 v. Redding*, 557 U.S. 364, 374 (2009) ("[S]trip search is a fair way to speak of" a search in which a female is asked to strip down to her underwear and pull out her bra.").

search is unreasonable.  For example, in *Byrd v. Maricopa County Sheriff's Dep't*, 629 F.3d

1135, 1141 (9th Cir. 2011) (en banc), the Ninth Circuit held that a cross-gender strip search of

pretrial detainee's genital area absent exigent circumstances and in the presence of onlookers

was unreasonable.  *Id.* at 1142 (searching officer touched [the pretrial detainee's] inner and outer

thighs, buttocks, and genital area with her latex-gloved hand through very thin boxer shorts," and

"moved his penis and scrotum in the process of conducting the search").  The court explained

that the "scope of this intrusion totally thwarted any desire on [the detainee's] part to 'shield [his]

unclothed figure from [the] view of strangers . . . of the opposite sex . . . ." *Id.* (quoting *York v.

Story*, 324 F.2d 450, 455 (9th Cir. 2011)).  The USMS defendants try to distinguish *Byrd* as too

recent to constitute a "clearly established" right.  But the court in *Byrd* was considering conduct

that took place in 2009, and it concluded, after an extensive review of earlier cases, that the

"litany of cases over the last thirty years has a recurring theme: cross-gender strip searches in the

absence of an emergency violate an inmate's right under the Fourth Amendment to be free from

unreasonable searches."  *Id.* at 1146 (citing and discussing cases).  Indeed, the USMS's own

regulations do not permit physical touching of any kind for either an "in-custody" or a "strip

search."  *See* USMS Search Policy at 2-3 ("A strip search (visual examination) *should not*

involve touching the skin surface.")

  In the end, the ultimate question for purposes of qualified immunity is whether a

reasonable officer would have known that the searches of plaintiff were unreasonable.  Based on

the alleged facts, which must at this stage be accepted as true, the Court concludes that a

reasonable officer would have known that a cross-gender search of a female detainee by male

USMS employees that included intimate physical contact, exposure of private body parts, and

verbal harassment, all in front of male detainees and male USMS employees in the absence of an

emergency, was unreasonable.  All of the relevant factors – "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted" – support a finding of unreasonableness.  And unlike the cross-gender searches which other courts have found to be reasonable, the searches here were not limited to distant visual observation or touching of outer garments only.  In addition, certain aspects of these searches could be found to have been abusive given their highly intrusive nature, the unnecessary verbal harassment, and the unauthorized physical contact.  Nor, at least as alleged, were there any extenuating circumstances or security interests that might justify otherwise unreasonable searches.

Accordingly, the Court concludes that plaintiff has alleged a violation of clearly established Fourth Amendment rights and, therefore, that the USMS defendants are not entitled to have those claims dismissed on the ground of qualified immunity.

### B.    Fifth Amendment Claims

Plaintiff claims that her Fifth Amendment right to due process was violated by the conditions of confinement while she was in USMS custody and in MPD custody.  (Compl. ¶¶ 137-156).  Specifically, she objects to the USMS's decision to hold her in a bullpen with male detainees, have her urinate in a cup in front of male detainees, transport her while chained to male detainees, and have her searched by male USMS employees and the MPD's decision to hold her in a single cell in the male area of the Central Cellblock.  (*Id.* ¶¶ 35, 36, 51, 52, 62, 66, 69, 84-86, 141, 142, 143, 145, 150, 152, 155.)  Conboy, Kates and Quicksey all argue that they are entitled to qualified immunity because none of these actions violated a clearly established constitutional right.  (USMS Mem. at 15; Quicksey Mem. at 3.)

17

The Due Process Clause, rather than the proscriptions of the Eighth Amendment against cruel and unusual punishment, governs the validity of the conditions and restrictions of confinement for detainees charged with crimes but not yet convicted.  *See Brogsdale v. Barry*, 926 F.2d 1184, 1188 (D.C. Cir. 1991).  However, because the due process rights of a pretrial detainee "are at least as great as the Eighth Amendment protections available to a convicted prisoner," *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998); *Hardy v. District of Columbia*, 601 F. Supp. 2d 182, 190 (D.D.C. 2009), a pretrial detainee's rights are violated if she is "incarcerated under conditions posing a substantial risk of serious harm" and the detaining official's "state of mind is one of 'deliberate indifference' to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991)); *see, e.g*., *Hardy v. District of Columbia*, 601 F. Supp. 2d 182, 190 (D.D.C. 2009) (violation of constitutional rights of pretrial detainee if the officials "knowingly disregarded a substantial risk of serious harm of which they were aware").  A serious risk of harm includes harm that could be inflicted by other detainees or guards.  *See, e.g.*, *Farmer*, 511 U.S. at 834.  To show deliberate indifference, "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842.  The question of "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

Plaintiff claims that the conditions of her confinement while in USMS and MPD custody exposed her to a substantial risk of serious harm, that USMS and MPD employees "knew that such harm was likely to occur based on a report from the D.C. Office of the Inspector General, an MPD General Order [the MPD Transgender Order], MPD Standard Operating Procedure [the

MPD Transgender Order], and complaints or reports from previous detainees and advocacy groups" (Compl. ¶¶ 20, 35, 40, 48, 52, 65, 69, 77, 85), and that the employees "intentionally, deliberately, or recklessly disregarded that risk." (*Id.* ¶¶ 141-43, 143, 145, 151-56.) She concludes that these actions reflected a "deliberate indifference to [her] safety and dignity" in violation of her Fifth Amendment right to due process. (*Id.* ¶¶ 143, 145, 150-56; *see also id.* ¶¶ 20, 35, 36, 40, 48, 52, 65, 66, 69, 77, 85, 139, 141, 142.)

Defendants argue that they are entitled to qualified immunity because plaintiff's due process right not to be held in the alleged conditions of confinement is not clearly established. Specifically, defendants rely on the absence of any cases specifically holding that a female transgender detainee has the right not to be held with male detainees or otherwise treated as if she were male. They also point to the conclusion by a district court in Arizona that a transgender immigration detainee "does not have a clearly established constitutional right to be housed in a women's detention facility or in a single-occupancy cell in a men's detention facility or to be released from detention based solely on her status as a transgender woman." *See Guzman-Martinez v. Corrections Corp. of America*, 2012 WL 2873835, at \*9 (July 13, 2012).

Defendants' arguments again miss the significance of the fact that plaintiff is legally a female and that defendants are alleged to have known that. Thus, the absence of transgender cases is not itself dispositive. Nor is the decision in *Guzman-Martinez* controlling, because the transgender detainee plaintiff in that case was not legally female. *See id.* at \*2 ("Plaintiff describes herself as a transgender woman, who was born biologically male, but self-identifies as female. She has undergone surgical alterations to her breasts, buttocks, hips, and legs to appear more feminine and, at the time she was detained, was taking hormones and estrogen to prepare for gender reassignment surgery. She does not claim to be biologically female presently.")

Rather, as with the Fourth Amendment claim, plaintiff's "clearly established" rights include the same rights as any other female detainee.

Accordingly, the cases involving the sexual harassment of female prisoners are not, as defendants suggest, "irrelevant." And those cases establish that a female detainee has the right not to be sexually harassed, verbally or physically, by other detainees or guards. *See Women Prisoners of the District of Columbia Dep't of Corrections v. D.C.*, 877 F. Supp. 634, 664–67 (D.D.C. 1994) (sexual assault, coercion and harassment of the sort alleged by plaintiff violate contemporary standards of decency and can cause severe physical and psychological harm); *see also Farmer v. Brennan*, 511 U.S. at 834 (1994) (unsolicited sexual touching, harassment, and coercion are "simply not part of the penalty that criminal offenders pay for their offenses against society" (internal quotations omitted)); *Hudson v. McMillian*, 503 U.S. at 6–7 (where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the harassment itself may also be sufficient evidence of a malicious and sadistic state of mind"). Moreover, at least in this Circuit, "the threshold for establishing a constitutional violation is clearly lower for the pretrial detainees." *See Brogsdale*, 926 F.2d at 1187 n.4.[28] Considering the allegations in the complaint, applicable MPD policies, and existing caselaw, the Court concludes that a reasonable officer would know that treating a female detainee as plaintiff was treated (*i.e.* holding her with male detainees and otherwise treating her as if she were male)

---

[28] In *Brogsdale*, the D.C. Circuit observed that under the Supreme Court's decision in *Youngberg v. Romeo*, 457 U.S. 307 (1982), a pretrial detainee has "a constitutional entitlement" to a "'reasonably safe' prison environment," noting that in *Youngberg*, the Court considered a due process challenge to the conditions under which Pennsylvania confined the profoundly retarded in state institutions and held that due process required the state to provide for the basic material needs of its wards, as well as 'reasonable safety for all residents and personnel within the institution.'" *Brogdsdale*, 926 F.2d at 1190 (quoting *Youngberg*, 457 U.S. at 324).

exposed her to a substantial risk of serious harm,[29] and, therefore, would know that those actions violated her constitutional rights.

None of the defendants' other arguments alter this conclusion.  For example, Quicksey argues that she is entitled to qualified immunity "based on the fact that MPD personnel followed [the MPD Transgender Order] which requires that 'whenever practical, transgender arrestees shall be placed in a cell by him/herself, even when more than one transgender person is in custody at the same MPD facility at the same time.'"  (Quicksey Mot. at 5 (quoting MPD Transgender Order at 7).)  However, as plaintiff points out, the MPD employees also failed to comply with the requirement in the MPD Holding Facilities Procedures that male and female detainees be separated by sight and sound, even though there does not appear to be any direct conflict between these two policies.

Conboy and Kates argue that "reports, regulations, and professional guidelines are not independent sources of constitutional rights and certainly do not articulate clearly established constitutional rights."  (USMS Mot. at 15 (citing *Davis v. Scherer*, 468 U.S. 183, 194 & n.12 (1982) ("Official sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision").  Plaintiff does not dispute that this is the law, but points out that her citation to outside sources is not "to establish 'independent sources of constitutional rights,' but rather to provide factual grounding to support the inference that the risk to transgender detainees was obvious, well-documented, and known to [d]efendants."  (Pl. Opp. to USMS Mot. at 19 (quoting USMS Mot. at 15).)  Plaintiff notes, correctly, that the Supreme Court and this Circuit have recognized that "regulations and reports

---

[29] Quicksey's suggestion that plaintiff was not incarcerated under conditions posing a serious risk of harm because she was "in a cell alone" (Quicksey Reply at 4) is contrary to the allegations in the complaint.

may provide a defendant with notice that . . . conduct is unconstitutional." *Hope*, 536 U.S. at

741; *Estate of Gaither v. District of Columbia*, 833 F. Supp. 2d 110, 124 n.7 (D.C. 2011).[30]

Finally, Conboy and Kates also argue that the USMS employees cannot have known that

more action was necessary to protect transgender detainees based upon reports and orders from

the District of Columbia government.  (USMS Reply at 8 (citing *Wormley v. United States*, 601

F. Supp. 2d 27, 41-42 (D.D.C. 2009) (rejecting argument that BOP director should have known

to provide more training based on past overdetentions by District of Columbia Department of

Corrections officials).)  However, given the close interaction and overlapping responsibilities

between the MPD and the USMS for post-arrest detentions, plaintiff's contention is not

implausible.

Accordingly, the Court concludes that plaintiff has alleged a violation of clearly

established Fifth Amendment rights based on the conditions of her confinement while in USMS

and MPD custody and, therefore, that neither Kates, Conboy, or Quicksey is entitled to have

those claims dismissed on the ground of qualified immunity.[31]

---

[30] Given plaintiff's response, there is no need to address defendants' alternative argument that if
these reports could be a source of constitutional rights, "the broadly worded provisions in the
reports and orders Plaintiff relies upon imposed no mandatory duty for a transgender female
detainee to be housed with female detainees or singly, or to have contact only with female
detention officers."  (USMS Mot. at 15.)

[31] Having reached this conclusion, it is not necessary to address plaintiff's alternative theory of
due process liability – that plaintiff's treatment amounted to unconstitutional "punishment."  *See
Bell v. Wolfish*, 441 U.S. 520, 535, 538-39 (1979) ("[i]n evaluating the constitutionality of
conditions or restrictions of pretrial detention that implicate only the protection against
deprivation of liberty without due process of law . . . the proper inquiry is whether those
conditions amount to punishment of the detainee" because "a detainee may not be punished prior
to an adjudication of guilt in accordance with due process of law").  Moreover, although this
theory of liability was raised during the briefing of the motions to dismiss, it was not included in
the complaint.

II.     **SUPERVISORY LIABILITY**

As an alternative ground for dismissal, Conboy and Kates each argue that the allegations

of the complaint are insufficient to state a claim because they fail to allege that either had

"personal involvement" in the alleged constitutional violations.  (USMS Mot. at 18.)

To state an individual capacity claim against a government official for damages under

*Bivens*, a plaintiff "must plead that each Government-official defendant, through the official's

own individual actions, has violated the Constitution."  *Id.*; *see also Simpkins v. District of

Columbia*, 108 F.3d 366, 369 (D.C. Cir. 1997) (plaintiff must allege that official "was personally

involved in the illegal conduct").  "Government officials may not be held liable for the

unconstitutional conduct of their subordinates under a theory of *respondeat superior*."  *Iqbal*,

556 U.S. at 676.  The absence of vicarious liability does not mean, however, that an official who

does not directly participate in the constitutional violation can never be personally liable.  Rather,

in addition to "direct participation" in a constitutional violation, a government official may be

held liable in damages for constitutional wrongs resulting from the "establishment of

unconstitutional policies" ("Policymaking Liability") or from the "failure to supervise or train

subordinates adequately" ("Supervisory and Training Liability").  *Haynesworth*, 820 F.2d 1245,

1259, 1263 (D.C. Cir. 1987), *rev'd on other grounds*, *Hartman v. Moore*, 547 U.S. 250 (2006).

*Policymaking Liability*: To state a claim against a government official for personal

liability in damages "for constitutional infringements resulting from the establishment of

unconstitutional policies," a plaintiff  must plausibly allege (1) "that the official against whom

liability is asserted has the power - vested either formally or as a practical matter - to formulate

policy"; (2) that the official "has exercised that policymaking authority to generate improper

practices"; and (3) that there is a "causal connection between the policy established and the

wrong committed."[32]  *Haynesworth*, 820 F.2d at 1263-64; *see also Weise v. Jenkins*, 796 F.

Supp. 2d 188, 197 (D.D.C. 2011) ("[T]o establish a claim for policymaking liability under

*Bivens*, a plaintiff must show that the official (1) established a policy (2) that was

unconstitutional and (3) caused the plaintiff to be injured.").

 *Supervisory and Training Liability*:  Alternatively, to state a claim against a government

official for damages based on a failure to supervise or train, "[t]he party seeking to impose

liability must demonstrate that the official had an obligation to supervise or train the wrongdoer

in the manner alleged, that the duty was breached, and that this breach was a proximate cause of

the injury."[33]  *Haynesworth*, 820 F.2d at 1260.  "[M]ore than mere negligence [is required] to

forge the 'affirmative link' required "between the constitutional infringement and the

supervisor's conduct."  *Id.* at 1261.  Rather, "[t]he duty to supervise is triggered by proof that,

absent effective supervision, harm was not merely foreseeable, but was highly likely, given the

circumstances of the case."  *Id.*; *see Elkins v. District of Columbia*, 690 F.2d 554, 566 (D.C. Cir.

2012); *see also Int'l Action Ctr. v. United States*, 365 F.3d 20, 28 (D.C. Cir. 2004) (liability will

attach where the supervisor "know[s] about the conduct and facilitate[s] it, approve[s] it,

condone[s] it, or turn[s] a blind eye for fear of what they might see").[34]  Failure to train liability

---

[32] The promulgation of unconstitutional policies may also lead to municipal liability.  *See Haynesworth*, 820 F.2d at 1264 n.145.

[33] In *Haynesworth*, the Court explained that holding an official liable in damages for constitutional wrongs engendered by his failure to supervise or train subordinates adequately "is not premised on the notion of vicarious liability; rather, it is bottomed on the principle that in some contexts failure of an official to safeguard against constitutional transgressions by those under his control constitutes an actionable wrong under *Bivens* and Section 1983." *Haynesworth*, 820 F.2d at 1259-60.

[34] "Our decision does not shift the level of culpability required to establish the underlying violation; that must turn on the nature of the constitutional provision allegedly infringed.  Nor does it affect the showing essential to municipal liability for inadequate supervision, since the

"is triggered only when a supervisor fails to provide more stringent training in the wake of a history of past transgressions by the agency or provides training 'so clearly deficient that some deprivation of rights will inevitably result absent additional instruction.'" *Elkins*, 690 F.3d at 566 (quoting *Int'l Action Ctr.*, 365 F.3d at 27); *see also Barham v. Ramsey*, 434 F.3d 565, 578 (D.C. Cir. 2006) ("Merely being [the alleged wrongdoer's] supervisor was not enough to attach liability to [the Chief of Police]."

As previously noted, plaintiff's Fourth and Fifth Amendment claims against both Conboy and Kates are predicated on their service as U.S. Marshals for the Superior Court, with responsibility "for setting policies regarding the detention of individuals in the United States Marshals Service cellblock and the training, discipline and direct supervision of Unknown U.S. Marshals Service Employees."  (Compl. ¶ 8.)  However, their situations are not identical. Plaintiff seeks to hold Conboy liable based on policies he allegedly created while he was the Superior Court Marshal, even though he ceased to hold the position in 2008, before any of the incidents giving rise to the complaint occurred, whereas she seeks to hold Kates liable for the June 2009 and December 2009 incidents, which occurred while he was the Superior Court Marshal, based on an alleged failure to train, discipline or supervise.  (*Id.* ¶¶ 123, 127, 138, 140, 143, 144, 145).[35]  Accordingly, the Court will address each defendant separately.

---

problem of determining whether a governmental entity should be charged with responsibility for the acts of its employees is conceptually distinct from the question whether the wrongs of one municipal worker should be imputed to another."  *Haynesworth*, 820 F.2d at 1262.

[35] Plaintiff's claims against Quicksey are also based an alleged failure to train, supervise or discipline – in er case, the unknown MPD employees who made the decisions to hold plaintiff in a single cell in the Central Cellblock.  (Compl. ¶¶ 51, 84, 153, 156.)  Quicksey, however, does not argue that the claims against her should be dismissed on the ground that there are insufficient allegations of her personal involvement.

### A.      Conboy

Conboy is alleged to have "created" two unconstitutional policies when he was the Superior Court Marshal.  The first policy, "a policy of having male U.S. Marshals search female transgender detainees" (*id.* ¶¶ 126, 130, 134) is alleged to have "caused the unconstitutional cross-gender search[es]" in violation of the Fourth Amendment.  (*Id.* ¶¶ 126, 130, 134.)  The second policy, "an official policy, custom, or practice of intentionally disregarding gender information about transgender detainees communicated by employees of the Metropolitan Police Department to members of the United States Marshals Service upon remand of the detainee to the custody of the United States,"[36] is alleged to have caused the Fifth Amendment violations. (*Id.* ¶¶ 28, 39, 61, 68, 90, 139.)

Conboy has moved to dismiss on the ground that the complaint fails to allege two of the elements necessary to state a claim for policymaking liability under *Haynesworth*: (1) the existence of an unconstitutional policy; and (2) that Conboy was personally involved in the creation of any policy with respect to the treatment of transgender detainees.  (USMS Mot. at 19; USMS Reply at 8-10.)  The Court agrees with the USMS that the complaint's "conclusory allegations" are insufficient "to establish Conboy's personal involvement in formulating a policy of 'ignoring' gender information presented by MPD employees and a policy of having male U.S. Marshals search female transgender detainees."  (USMS Reply at 10.)  Plaintiff cannot simply allege that the official she seeks to hold liable created a unwritten or de facto policy that led to her constitutional injuries absent any factual basis for that allegation.  *See, e.g.*, *Weise v. Jenkins*, 796 F. Supp. 2d 188, 200 (D.D.C. 2011) ("Although Defendants undoubtedly had the formal

---

[36] This policy is also described as "a written or de facto policy of intentionally disregarding gender information about transgender detainees."  (Compl. ¶ 9.)

power to formulate a national policy, Plaintiffs must establish that Defendants actually exercised

that power to generate improper practices."). Everything that happened to plaintiff happened

after Conboy was no longer the Superior Court Marshal, thus her treatment while in custody,

while it might support an inference that these policies existed, does not support the allegation

that Conboy created such policies during his tenure. Nor does the complaint allege that any

other transgender detainee experienced treatment similar to plaintiff's while Conboy was

Superior Court Marshal. Finally, although the MPD issued the MPD Transgender Order while

Conboy was the Superior Court Marshal, that alone is not sufficient to support an inference that

Conboy created the alleged policies in response thereto. Accordingly, the claims against Conboy

will be dismissed on the ground that the complaint fails to plausibly allege that he created either

a policy of having male USMS employees search female transgender detainees or a policy of

ignoring a detainee's transgender status.

### B.    Kates

Kates is alleged to have failed to train, supervise or discipline subordinate USMS

employees in the appropriate treatment of female transgender detainees. (Compl. ¶¶ 27, 38.) His

motion to dismiss contends that the allegations of the complaint are insufficient to state a claim

because neither his "ultimate authority" nor the allegations that "focus on his training and

supervision" are sufficient to "render [him] personally liable for the alleged wrongful acts of

individual USMS employees."[37] (USMS Mot. at 18.) There is no question that Kates cannot be

---

[37] The complaint relies on two distinct theories of liability to support the claims against Kates: policymaking liability for the Fourth Amendment claim and supervisory and training liability for the Fifth Amendment claim. (*See* Compl. ¶¶ 126, 130, 140, 143-45.) However, the USMS defendants' motion to dismiss appears to assume that the only claims against Kates are based on a theory of supervisory and training liability, which he challenges without distinguishing between the Fourth and Fifth Amendment violations. Accordingly, for purposes of this motion,

held liable for the actions of subordinates based solely on his position as the Superior Court

Marshal (his "ultimate authority"), but that is not what plaintiff alleges.[38]  (*See* Compl. ¶¶ 27-28.)

As for his alleged failure to train, supervise or discipline, he argues that the allegations are

insufficient to establish that he had an obligation to train or supervise in the manner plaintiff

alleges – on not treating female transgender detainees as if they are male.[39]  (USMS Reply at 9.)

Relying on *Elkins*, Kates asserts that the complaint (1) fails to allege "any history of

constitutional transgressions by USMS" and thus "'no pattern of constitutional violations to put

[the official] on notice that training was required'" (USMS Reply at 9 (quoting *Elkins*, 690 F.3d

at 566); and (2) fails to allege "training that is so clearly deficient . . . that some deprivation of

constitutional rights will inevitably result."  (*Id.*)

Plaintiff appears to concede the first point, but not the second.  As she points out, the

complaint alleges that Kates engaged in *no* training or supervision as to the treatment of female

---

the only issue before the Court is whether the complaint fails to state a claim against Kates for
supervisory and training liability.

[38] The citation to *Akers v. Watts*, does not help defendants' argument because the court in Akers
dismissed defendants against whom there were no allegations of either policymaking liability or
supervisory or training liability.  740 F. Supp. 2d 83, 93 (D.D.C. 2010).

[39] Specifically, plaintiff claims that Kates is liable for failing to adequately train "on the need to
individually evaluate female transgender pretrial detainees to determine whether the inmate
should be placed in a cell alone or with women, instead of with men" (Compl. ¶¶ 38, 67, 140),
"about the likelihood of harm from placing a transgender woman in a bullpen with men" (*id.* ¶
69), "on the need to allow female transgender pretrial detainees the same privacy accorded to
other female detainees" and not require someone like plaintiff to expose her genitalia and urinate
in a cup in front of men (*id.* ¶¶ 36, 143), "on the need to have female U.S. Marshals Service
employees search female transgender pretrial detainees" (*id.* ¶ 144), and "on the need to have
gender-appropriate searches of transgender detainees."  (*Id.* ¶ 145). In addition, plaintiff claims
Kates is liable for failing to adequately supervise and discipline USMS employees who "placed
transgender women at risk for harm by placing them in a bullpen with men"(*id.* ¶¶ 38, 67, 69,
140), "required female transgender detainees to urinate in front of men" (*id.* ¶¶ 36,  143), were
male and "searched female transgender detainees" (*id.* ¶ 144), "who decided or ordered male
[USMS] employees to conduct searches of female transgender detainees" (*id.* ¶ 144), or
"physically and sexually abused detainees during searches."  (*Id.* ¶ 145.)

transgender detainees despite knowing the harm that was "likely to occur" if plaintiff were treated as if she were male. (Pl. Opp. to USMS Mot. at 22-23.) The question is not whether plaintiff's claim against Kates will ultimately succeed, but only whether these allegations are sufficient to adequately allege an obligation to train or supervise as to the appropriate treatment of female transgender detainees. Kates focuses on "plaintiff's citation to a Management Alert Report issued by the D.C. Office of the Inspector General issued on April 4, 2008," arguing that there is no basis to infer from that report any awareness of the type of problem that ultimately occurred. However, that report is not the only basis for plaintiff's allegation that harm was likely and that Kates knew it. (*See id.* at 22-23 (citing ¶ 35 (allegations that harms was likely to occur based on numerous complaints and reports)).) These reports, along with the "obviousness" of the risk of harm when a female detainee, transgender or not, is treated as plaintiff was, are sufficient to allege an obligation to train or supervise and allow the claims against Kates to proceed.

## III.    CLAIMS AGAINST CHIEF OF POLICE LANIER

Lanier argues that the claims against her under the D.C. Human Rights Act should be dismissed for lack of proper service or because they are duplicative of the claims against the District. (Lanier Mot. at 1.) The Court agrees that Lanier has not been properly served as Lanier was not named as a defendant prior to the filing of the First Amended Complaint. Thus, service of process must satisfy Federal Rule of Civil Procedure 4, not Superior Court Civil Rule 5. Accordingly, the claims against Lanier will be dismissed without prejudice.[40]

---

[40] Plaintiff may seek additional time to properly serve Lanier, but the Court doubts that her presence in the case is necessary. The sole claim against Lanier is against her in her official capacity and is limited to seeking injunctive relief. (*See* Compl. ¶¶ 163-64; Prayer for Relief (plaintiff seeks an injunction to correct the PDID database to reflect plaintiff's legal name and

**CONCLUSION**

Accordingly, and for the reasons stated above, the USMS defendants' motion to dismiss will be granted as to the claims against Conboy, but denied as to the claims against Kates and Musgrove; Quicksey's motion to dismiss will be denied; and Lanier's motion to dismiss will be granted.  A separate Order accompanies this Memorandum Opinion.


                                    _____/s/_____
                                    ELLEN SEGAL HUVELLE
                                    United States District Judge

Date: May 13, 2013

_____

sex)).  This relief can be achieved without naming Lanier as a defendant because the District is already a named and properly served defendant.